**Maryland Casualty Company, a Corporation, Plaintiff-Appellee, v. 222 East Chestnut Street Corporation, a Corporation, Defendant-Appellant.**

**Gen. No. 54,548.**

First District, First Division.

September 21, 1970.

Edward S. Macie, of Chicago, for appellant.

Rappaport, Clorfene & Rappaport, of Chicago (Hamilton Clorfene, of counsel), for appellee.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

Plaintiff, Maryland Casualty Company (hereinafter referred to as Maryland), sued to recover from 222 East Chestnut Street Corporation (222) bond premiums al-

leged to be due from 222 for the second and subsequent years on a supersedeas bond. This cause was tried without a jury. Judgment was entered for Maryland in the sum of $6,782.40 for premiums at the rate of $1,200 per year, plus interest. From this judgment, 222 appeals.

The supersedeas bond, in the sum of $60,000, was executed by Maryland as surety and by 222 as principal on September 4, 1956. It was filed in the Supreme Court of Illinois to stay a judgment entered by the Circuit Court affirming an order of the Chicago Zoning Board. 222 paid a premium of $1,200 and deposited shares of American Telephone and Telegraph stock, then with a market value of $90,000, with Maryland as security. The liability on the bond was terminated in 1963.

The main issue is whether 222 is liable to Maryland for annual premiums of $1,200 for the life of the bond or whether the bond was to be a single-premium bond making the $1,200 which 222 paid to Maryland full payment for its execution.

The cause was tried on Maryland's second amended complaint of April 8, 1964, and upon the amended answer of 222. Maryland alleged that 222 paid the sum of $1,200 in 1956, as the first annual premium on the supersedeas bond, but although the bond remained filed until April 30, 1963, and invoices were sent to 222 after September 4, 1957, no further payments were made. 222 alleged that at the time of the execution of the bond it was orally agreed between its agent, Joseph F. Elward, and Thomas E. Ryan, the duly authorized and acting agent of Maryland, that 222 would cause to be deposited negotiable stocks in excess of $90,000 as security and would pay a total premium of two percent of the $60,000 bond or $1,200, which was paid. Nothing more was due to Maryland.

No application or other writing was ever signed by or on behalf of 222 whereby it agreed to pay an annual premium. Ryan and Elward were the only persons with personal knowledge of the transaction and were the only witnesses at the trial.

Maryland called Joseph F. Elward as plaintiff's witness under section 60. Elward testified that at the time

of the transaction he was secretary and attorney for 222. Ryan had written many bonds for him since 1916. He said he talked to Ryan in Ryan's usual office in the Probate Court Clerk's office in early September 1956 about a supersedeas bond for 222. He told Ryan that 222 was the owner of a nineteen-story unfurnished apartment building which was subject to a small mortgage. Ryan told him that under this circumstance he believed collateral would be unnecessary. Elward said that he informed Ryan that he would be willing to put up A. T. & T. stock with a market value of $90,000 as security because he did not know how long the litigation would last, but he wanted a one-premium bond. Ryan told him that he would have to discuss with someone whether this could be a single-premium bond, but he thought there would be no difficulty about it. Elward said that the next time he talked to Ryan he was told that it was all right about the single premium. Ryan did not ask him to sign any application when the bond was executed, nor did Ryan indicate that the A. T. & T. stock was not ample collateral for the bond. Ryan did not tell him that he was without authority to write the bond. When 222 subsequently received an application and collateral agreement in the mail, Elward did not sign the documents. He promptly replied to each of Maryland's requests for an annual premium that there was no such agreement.

Thomas E. Ryan, called as Maryland's witness, testified that he was a special agent for Maryland with authority to solicit, write and sign bonds. He said that the handwriting on the bond was his, but he didn't remember his conversation with Elward because it had happened thirteen years ago, since which time he had written about 15,000 bonds. He said that although he didn't remember, he must have requested collateral because he wouldn't sign that kind of a bond without some sort of collateral. He said he took the matter up with Madden who was the manager of Maryland's bonding office and his direct supervisor. He thought that Madden would also have to seek approval from the company. He didn't remember if Madden gave him authority to sign the bond, but said that Madden must have given him some

kind of authority, because he did sign the bond. Ryan said that he sometimes signed bonds and then obtained the signature of the other party. Ryan didn't deny that Elward made application with him for a single premium bond and didn't know whether or not he granted such an application. Ryan said that in order to determine the premium rate for a bond he would refer to Maryland's manual and in 1956 he did not have authority to write bonds for less than the stated rate.

Joseph F. Elward then testified on direct as defendant's witness. He said that he told Ryan that while the building owned by 222 was ample security for the bond he would put up additional security if the bond was drawn to require only one premium. After he delivered the collateral, the bond was signed by Ryan. Elward later received a letter from Maryland requesting 222 to execute the collateral agreement. He told Ryan that the document did not state that it was a one-premium bond in accordance with their conversation, and Ryan told him that it was an oversight which he would correct.

In this court Maryland contends that 222 failed to prove the alleged oral agreement for a single-premium bond or that any such agreement was authorized by Maryland, but the issue is whether Maryland, as plaintiff, proved that the agreement was for an annual-premium bond. This it did not do. The record clearly establishes that no document was ever signed by 222 in which it agreed to an annual premium. Ryan, who for many years was the agent for Maryland and had authority to sign bonds on behalf of Maryland without any countersignature, did sign the bond. It is uncontested that Elward told Ryan that he was only interested in a single-premium bond for which he would be willing to put up as collateral $90,000 in A. T. & T. stock. Ryan did not deny this testimony, nor did he deny that he took up the matter with his firm and then told Elward that it was all right. The evidence further shows that when Maryland sent bills for annual premiums to 222, Elward immediately informed Maryland that he had only agreed to a one-premium bond. Elward's testimony as to such an oral agreement was positive and definite. Ryan wasn't sure what he had told Elward.

■ Maryland further contends that its rate schedule filed with the Illinois Department of Insurance as required by Ill Rev Stats 1955, c 73, § 1065.4, provided for annual premiums of $20 per $1,000 on a supersedeas bond. This section also requires adherence by the insurer to the rate schedule. Although the 222 deposited $90,000 of A. T. & T. stock as security for the bond, Maryland alleges that the schedule provided that the premium could be reduced only if cash or government securities were deposited as collateral. Maryland alleges that this schedule was implied in the agreement and thus required 222 to pay an annual premium.

■ ■ The record does not clearly establish this schedule. We think it would be unjust to permit Maryland to repudiate as illegal the oral agreement for a one-premium bond which it had made with 222 through Ryan, its general agent, and thereby enrich itself. In Watertown Fire Ins. Co. v. Rust, 141 Ill 85, 88, 30 NE 772, an insurance company argued that a policy which it had written after its authority to transact business in the state had ceased was void. It was there stated that:

> Our statute was manifestly enacted for the protection of the public against the acts of irresponsible foreign insurance companies. The duties it enjoins and the penalties it imposes are upon the insurance companies, and not upon those who in good faith contract with them. The insurance company knows whether it has complied with the law, but the public do not, and they have the right, in the absence of bad faith and of actual knowledge to the contrary, to presume that a foreign insurance company assuming to act in this State is acting lawfully, and the company, when sued upon a policy issued under such circumstances, is estopped to allege that it had no lawful authority to issue the policy. (Citing authorities.)

There is no evidence that 222 acted in bad faith or with knowledge that the bond agreement was in violation of any law. It deposited sufficient collateral to amply protect the insurer against any possible liability. When Elward objected to the bills for annual premiums, Mary-

land did not attempt to rescind the agreement as being in violation of law. It cannot now repudiate it.

Maryland relies on Merchant's Nat. Bank of Peoria v. Nichols & Shepard Co., 223 Ill 41, 79 NE 38, for the proposition that persons dealing with an assumed agent are bound at their peril to ascertain not only the fact of the agency, but also its extent. In that case, the court held that a Peoria sales agent of a nonresident company had no authority to write drafts on his employer's bank account because that was not implied in the agent's authority to make sales and collect the proceeds. The court also stated that a principal may be bound to the extent of the apparent authority which it has conferred on its agent.

In the case at bar, unlike the Merchant's case, Ryan as the plaintiff's agent did have the authority to write the bond. Attached to the bond was a printed form of authority from Maryland to Ryan which recites, among other things, that Ryan has ". . . full power to act alone . . . (as) its Attorney-in-Fact to make, execute, seal, and deliver on its behalf as Surety, and as its act and deed, any and all bonds . . . ." Ryan thus clearly had authority to execute the bond without any additional signature. When he told Elward that he had checked and it was all right, Elward was not required to verify that fact again. Maryland never tried to rescind the transaction upon Elward's repeated protestations that the agreement had been for a single-premium bond.

After careful consideration we conclude for the reasons stated that the judgment of the Circuit Court should be reversed.

Reversed.

MURPHY and ADESKO, JJ., concur.